UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA                :
                                        :
                                        :       00 Cr. 152 (DLC)
              -v-                       :
                                        :       OPINION & ORDER
                                        :
ZAFAR CHAUDHRY,                         :
                           Defendant.   :
                                        :
----------------------------------------X

Appearances:

For the United States:
Robin W. Morey
United States Attorney Office
One Saint Andrew's Plaza
New York, NY 10007

For Defendant:
Bernard Alan Seidler
580 Broadway
New York, NY 10012


DENISE COTE, District Judge:

     Defendant Zafar Chaudhry has moved to dismiss the

indictment against him on the ground that his right to a speedy

trial under the Sixth Amendment to the U.S. Constitution was

violated.  Chaudhry was indicted in 2000, but lived in Pakistan

between 1998 and June 2010, when he was arrested upon his return

to the United States.  He asserts that the Government did not

inform him of the charges pending against him until October 8,

2008, at the earliest, or permit him to return to the United

States to answer those charges for the eighteen month period between December 22, 2008 and June 12, 2010.  For the following reasons, the motion to dismiss is denied.

Background

The Government has submitted a detailed factual presentation of the efforts it undertook to locate Chaudhry and to arrest him.  In support of the motion, Chaudhry's attorney has submitted a declaration, which Chaudhry adopts in part in a brief affidavit.[1]  These submissions provide the basis for the following description of events.

1998 Investigation; Chaudhry Leaves United States

According to the indictment against Chaudhry, he participated in a conspiracy from about 1996 to February 1998 to

---

[1] Chaudhry was advised by the Court that, to the extent his motion was premised on his own assertions of fact, the motion had to be supported by his affidavit.  His counsel's affidavit and a generalized adoption by Chaudhry is far from ideal, creates great ambiguity, and will not be read to assert facts that are not clearly adopted by Chaudhry.  Chaudhry asserts in his own brief affidavit:  "I have read the foregoing, and know the contents thereof, and the same is true to my knowledge, except to matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true." Chaudhry has not submitted any affidavit in reply to the Government's submission, and therefore has not adopted the facts asserted in his counsel's reply declaration.  Thus, the facts asserted in his reply are disregarded to the extent they are intended by defense counsel to be construed as the defendant's assertions of fact.

commit health care fraud.  Chaudhry is alleged to have participated in a scheme to submit fraudulent claims to Medicare for reimbursement for blood tests purportedly conducted at a laboratory located in the Bronx.  The indictment charges that Chaudhry and his uncle Raza Chudry ("Chudry") participated in the scheme together.

The federal investigation of the Bronx laboratory began with a referral by the Department of Health and Human Services to the Federal Bureau of Investigation ("FBI") in April 1998. Chaudhry recites that he left the United States in December 1998.

Arrest Warrant Issued: 2000

An arrest complaint was filed on January 11, 2000, charging Chaudhry, Chudry and a third defendant with conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 371, 1347. Arrest warrants were issued and information regarding the defendants was entered into the National Crime Information Center ("NCIC") database, a computerized index of criminal justice information that is available to all federal and state law enforcement agencies.  On January 13, an FBI agent used a database known as ChoicePoint to determine the most current address information for Chaudhry.  The database includes information from private businesses and from government

3

agencies.  The FBI also ran a database search through its Investigative Information Services Center ("IISC"), which revealed that Chaudhry had two New Jersey addresses.

The FBI arrested Chudry and the second co-conspirator on January 19, but it could not locate Chaudhry at either of the New Jersey addresses it had identified for him.  Since Chaudhry was not arrested, NCIC continued to reflect that he would be extradited if arrested outside of New York State.

The original indictment was filed on February 17, 2000, charging the defendants with conspiring to commit health care fraud by preparing false claims seeking reimbursement from Medicare for performing blood tests.  On June 13, 2000, Chudry participated in a proffer session with the Assistant United States Attorney ("AUSA").  During the interview, he indicated that the last time he had spoken to Chaudhry was roughly six months earlier; Chudry added, however, that he did not speak to his nephew about the indictment.  He indicated that he believed that Chaudhry was living in Pakistan.

A superseding indictment was filed on February 8, 2001. The superseding indictment expanded the time of the conspiracy and eliminated some allegations regarding the amount of the loss.  Chudry pleaded guilty in 2001, and was sentenced on January 16, 2002, principally to 55 months' imprisonment, and

was required to pay restitution in the amount of $836,910.51.
Chudry was released from custody on March 1, 2006.

In October 2002, the FBI interviewed a cooperating witness
in an effort to gather more information about Chaudhry's
whereabouts.  The witness indicated that the last time the
witness had seen Chaudhry was in 1998.

In November 2002 and January 2003, the FBI conducted
reviews of the ChoicePoint database, and found no new addresses
for Chaudhry.  In May 2003, the FBI requested Chaudhry's
immigration file from the Immigration and Naturalization Service
("INS").  The file showed that Chaudhry had arrived in the
United States from Pakistan in 1983, and had become a
naturalized citizen on March 8, 1990.

International Search for Chaudhry

In July 2003, the FBI requested a "quick diffusion" and an
Interpol Red Notice.  As a result, any country that runs a
search on the Interpol Automated Search Facility will learn that
there is an arrest warrant lodged against Chaudhry by United
States authorities.  By August, the notice had been disseminated
to 181 Interpol member countries, including Pakistan.  In
December 2003, the FBI requested all available United States
passport information on Chaudhry and ran a Treasury Enforcement
Communication Systems search for Chaudhry's travel in and out of

the United States.   The search inquiry did not extend as far

back as 1998, however, and therefore did not show that Chaudhry

had left the United States in 1998.

In January 2004, the FBI searched again for border crossing

records for Chaudhry.   In August 2004, Interpol published a Red

Notice for Chaudhry with his date of birth listed as December 1,

1961.   In essence, a Red Notice asks a member nation to locate a

fugitive and notify Interpol.   It indicates that upon

notification, the United States will formally request

provisional arrest with a view toward extradition.   In the event

the advising country does not have an extradition agreement with

the United States, it requests that the fugitive be excluded or

removed to a country with a binding extradition agreement.

Finally, it requests that, at a minimum, Interpol be notified of

the fugitive's movements.


Chaudhry is Located in Pakistan in 2006

In August 2005, someone sent an anonymous fax to the United

States Consulate in Karachi, Pakistan advising the consulate

that Chaudhry "who is at large and wanted by Government of

America" is involved in "suspicious and extremist activities."

It gave an address for Chaudhry in Islamabad.   The FBI Legat in

Pakistan asked the FBI case agent for a copy of the arrest

warrant for Chaudhry.   Although the Legat had indicated that he

6

would investigate whether Chaudhry was in fact in Pakistan, the consulate's response to the October 2005 earthquake in Pakistan may have delayed that investigation.  In any event, the FBI case agent inquired about the status of the investigation in February 2006 and learned that Chaudhry was living in Pakistan at the address identified by the anonymous source.

Thus, in February 2006, the FBI learned for the first time where Chaudhry was living in Pakistan.  In response to their inquiries, the FBI and United States Attorneys Office for the Southern District of New York ("USAO") were informed by the Department of Justice Office of Internal Affairs that efforts to extradite Chaudhry from Pakistan would be futile, given Pakistan's record of refusing to grant similar requests for extradition of defendants accused of white collar crimes.  The Government, which believed that Chaudhry was well aware of his uncle's prosecution and of the pending charges against him, decided not to make that futile effort.  Among other reasons, it did not want to identify the civilian witnesses whose evidence was necessary both to extradite and prosecute Chaudhry,[2] and it did not want to discourage Chaudhry from travelling to a country from which he could be extradited.  The USAO was under the mistaken impression that, as a result of the Red Notice,

---

[2] Chaudhry's co-defendants had both pleaded guilty.  As a result, with one exception, the identity of the civilian witnesses had not yet been disclosed.

Pakistan would both allow Chaudhry to travel abroad and alert the United States of that travel.  The Government did begin work, however, on an extradition request so that one would be ready in the event Chaudhry travelled to a country that would extradite him to the United States.

Chaudhry Contacts the USAO in 2008

On October 10, 2008, Chaudhry attempted to fly to Kuwait, but Pakistani officials would not permit him to board an airplane because he was the subject of a Red Notice.  Pakistani officials promptly advised Chaudhry of the outstanding warrant for his arrest in the United States, but did not detain him. Pakistan also advised Interpol of its action on October 14, and the FBI case agent was advised of these events on December 3. In January 2009, Chaudhry visited the United States Embassy in Pakistan ("Embassy") in an attempt to renew his passport, but the request was rebuffed due to the arrest warrant.  The FBI case agent learned of the Embassy's action on February 2, 2009.

Meanwhile, having been prevented by Pakistani officials from travelling abroad due to the American arrest warrant, Chaudhry retained New Jersey attorney Mark Gold ("Gold") to represent him.  On October 20, 2008, Gold wrote to the USAO, referring to the docket number and caption for the complaint against Chaudhry.  This was information from the original arrest

warrant which was listed in the Red Notice.  On October 30, Gold
filed a notice of appearance on behalf of Chaudhry, at which
point an AUSA faxed a copy of the superseding indictment to him.
In November, Gold tried to schedule a meeting with the AUSA and
with Chudry, who had been released from prison following the
completion of his sentence.  But, the USAO refused to discuss
the charges until Chaudhry returned from Pakistan and presented
himself for arraignment.  In response, Gold wrote that Chaudhry
would not be able to enter the United States "due to a warrant
for his arrest," which Chaudhry had told Gold had been entered
by Interpol.  Gold inquired, "What do we need to do to get him
entry to the U.S.?"  The AUSA advised Gold in a November 25,
2008 voicemail that either Chaudhry could return and be arrested
pursuant to the outstanding warrant or Chaudhry could advise the
Government of his travel plans in advance and the FBI agents
would meet him and arrest him upon arrival.  Gold did not
respond.

As noted, it was not until December 3, 2008 that the case
agent and the AUSA learned that Pakistan had not allowed
Chaudhry to leave Pakistan because of the Red Notice and had not
detained him.  Between December 3 and March 6, 2009, the AUSA
left multiple telephone messages for Gold advising him that once
the defendant provided proof that he had purchased a plane
ticket to travel to the United States on a non-stop flight or a

flight with minimal stops in acceptable places, then the USAO
would arrange with Interpol for the defendant to travel despite
the Red Notice.  Having received no response from Gold, on March
6, the AUSA sent these instructions to Gold in a letter.  On
April 8, Gold wrote that Chaudhry was ready to purchase an
airline ticket, but did not want to be arrested, and "would
prefer to work out something prior to his arrival" and be
released on his own recognizance.  The AUSA advised Gold that
upon his arrival Chaudhry would be presented on the charges and
bail conditions would be set by the court, and that the USAO
would not agree before his return to release Chaudhry on his own
recognizance.  Gold did not contact the USAO again.  There is no
evidence that Gold ever advised the USAO that Chaudhry was
having difficulty getting his passport renewed, and that that
difficulty was preventing Chaudhry from returning to the United
States to answer the criminal charges.

Chaudhry Attempts to Renew Passport in 2009

        According to Chaudhry, he was advised by the Embassy in
March 2009 that it "would be back in contact" with him, but it
was not until June 2010 that the Embassy did so.[3]  Chaudhry does

---

[3] Because these facts are contained in an attorney's affidavit
and the date "March 2009" is placed within brackets, it is
unclear whether Chaudhry has specifically adopted this
representation.

not identify with whom he spoke at the Embassy.  He reports that
the Embassy contacted him on June 12, 2010, and advised him that
he would be granted a one-week passport to travel to the United
States.

In November 2009, the FBI case agent tried to learn whether
Chaudhry had made any further attempt to renew his passport and
asked to be notified if he did so.  On May 26, 2010, the case
agent was advised that Chaudhry had again visited the Embassy to
renew his passport.  The FBI and the State Department promptly
agreed that the State Department could grant a "limited validity
passport" to Chaudhry, which would permit him to travel one-way
back to the United States, provided Chaudhry gave his travel
itinerary to the State Department.  Chaudhry then made
arrangements to return to the United States, and arrived in New
York on June 20.  To help ensure that Pakistan would not
interfere with Chaudhry's travel and apprehension, the FBI
requested that the Interpol Red Notice be cancelled.

At his arrest in New York on June 20, Chaudhry volunteered
that he had been advised of the criminal charges pending against
him in the United States when he attempted to obtain his
passport.  He explained that he had hired attorney Mark Gold in
New Jersey to find out about the charges, but that his further
efforts to contact Gold had been unsuccessful due to a
disconnected telephone number.  Chaudhry added that he had been

taking care of his ill father in Pakistan and that his father had died in 2009.

Discussion

Chaudhry moves to dismiss the indictment on the ground that his Sixth Amendment rights to a speedy trial have been violated by (1) the Government's failure to advise him of the charges against him between 2000 and December 2008, and (2) its failure to issue him a passport between December 2008 and June 2010.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Thus, the Government has a "constitutional duty to make a diligent good faith effort" to bring the defendant to trial without unnecessary delay. Smith v. Hooey, 393 U.S. 374, 383 (1969). Once the defendant has established that the length of the Government's delay in bringing him to trial is "presumptively prejudicial," the Court must engage in a balancing test to determine whether right of speedy trial has been violated. Barker v. Wingo, 407 U.S. 514, 530-31 (1972). The Court weighs three factors: "the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 530. In examining the reasons for the delay, a court determines whether the Government has exercised "due diligence" and operated in "good faith" in its effort to

bring the defendant to trial.  <u>United States v. Diacolios</u>, 837 F.2d 79, 82 (2d Cir. 1988); <u>see also</u> <u>United States v. Jones</u>, 91 F.3d 5, 8 (2d Cir. 1996).  None of the three factors is regarded "as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  <u>Barker</u>, 407 U.S. at 533.  "Whether a criminal defendant's right to a speedy trial has been violated is circumstance-dependent."  <u>United States v. Ray</u>, 578 F.3d 184, 191 (2d Cir. 2009).

In cases where the delay is due to the defendant's residence abroad, the Second Circuit has stated in <u>dicta</u> that the Government's failure to seek extradition of a defendant does not necessarily violate the requirements of due diligence.  <u>United States v. Salzmann</u>, 548 F.2d 395, 402-03 (2d Cir. 1976).  This is particularly the case where the country in which the defendant resides does not have an extradition treaty with the United States or otherwise would refuse to grant extradition.  <u>Diacolios</u>, 837 F.2d at 83-84.  Thus, due diligence "does not require the government to pursue that which is futile."  <u>Id</u>. at 83.

Length of Delay

Chaudhry was first indicted on February 17, 2000, and was arraigned on the superseding indictment on June 21, 2010.  Over ten years have elapsed since the filing of the original indictment and the filing of the motion to dismiss.  A delay of this length of time is presumptively prejudicial.  See Doggett v. United States, 505 U.S. 647, 652 (1992); Barker, 407 U.S. at 533.


Reason for Delay

The Government asserts that it acted diligently in its efforts to locate Chaudhry and pursue its prosecution of him. It asserts that it had no obligation to attempt to extradite him from a country that would not extradite him.

The Government searched diligently for Chaudhry in New Jersey in 2000, when his conspirators were first arrested on the complaint filed in this prosecution.  Failing to find him, it entered relevant information in law enforcement databases to assist in his location and arrest within the United States.  In 2003, the Government initiated the Interpol publication of the Red Notice to locate and arrest Chaudhry in the event he was living abroad.  In 2006, the Government learned where Chaudhry was living in Pakistan, but decided not to attempt to extradite him based on its evaluation that the effort would be futile.

14

During this entire time, the Government believed that Chaudhry
was aware of the indictment due to his uncle's prosecution.
Indeed, it believed that Chaudhry's departure from the United
States was motivated by his knowledge of the federal
investigation.  By the time that the Government learned in
December 2008 that Pakistan would not permit Chaudhry to leave
the country as a result of the Red Notice, it was engaged in
discussions with Chaudhry's attorney concerning his surrender.
After the Government advised Chaudhry's attorney that it would
not agree to have the defendant released upon his own
recognizance as a condition of his return to this country, the
Government received no further communication from his attorney.
In May 2010, when the FBI became aware of Chaudhry's efforts to
obtain a passport for entry into the United States, it promptly
made arrangements with the State Department for Chaudhry to be
granted a "limited validity passport" to travel to the United
States.

        Chaudhry blames the Government for the delay in his return
to this country, and identifies four ways in which it failed to
act diligently.  None of these assertions undermines the
Government's showing of diligence.

        First, Chaudhry argues that the Government had a duty to
notify him of the charges, and that his uncle would have advised
the Government of his address in Pakistan if his uncle had been

asked to do so during the proffer interview in 2000.  Chaudhry

has shown that it is likely that the Government could have

learned of his address in Pakistan in 2000.  During the proffer

interview, Chudry said that he had spoken to Chaudhry about six

months earlier, which was around the time of Chudry's arrest,

and that he believed that Chaudhry was living in Pakistan.[4]  The

Government was on notice from at least that time that Chaudhry

was living in Pakistan, and it could have asked Chudry or others

either where Chaudhry was living or where he was likely to be

living.  There is no evidence that it did so.  Indeed, it was

not until 2003 that the Government even broadened its search for

Chaudhry to include the international arrest warrant database,

Interpol's Red Notice system.  Nonetheless, even if the

Government could have learned that Chaudhry was living in

Pakistan in 2000, the Government has shown that Chaudhry's delay

in returning to the United States to answer the charges filed

against him cannot be fairly attributed to the Government's

failure to provide him with earlier notice of the charges.

     The Government's actions throughout the ten year period

were entirely consistent with its belief that Chaudhry was aware

of the charges, had fled, and would not voluntarily return.

This belief was entirely reasonable in the circumstances.

---

[4] Neither Chaudhry nor the Government has submitted any affidavit
from a participant in the 2000 proffer session between the
Government and Chudry.

Chaudhry had obtained U.S. citizenship, but left the country during the midst of a criminal investigation of his activities and did not return.  His uncle was a co-defendant in the scheme, admitted to having been in contact with Chaudhry around the time the arrest warrants in the case were executed, and spent years in federal prison as a result of his conviction.  It is almost inconceivable that Chaudhry's uncle or other relatives did not advise Chaudhry of the charges pending against him.

As significantly, Chaudhry never asserts in his affidavit in support of his motion that he was actually unaware of the federal charges between 2000 and 2010, or during any period within that time frame.  Instead, his sole sworn allegation about lack of "notice" is the fairly cryptic assertion that "[b]etween June 20, 2010, and October 8, 2008, Chaudhry was never notified of the existence of a federal warrant for his arrest."  October 8, 2008 is the date on which Pakistani officials prevented him from travelling to Kuwait and advised him of the Red Notice; June 20, 2010 is the date on which he arrived in the United States and was arrested.  Thus, Chaudhry's complaint is not that he was ignorant of the charges, but that the Government failed to formally give him "notice" of the charges.  Moreover, during the specific period identified by Chaudhry, he obviously had been given notice of the federal charges by Pakistani authorities.  Indeed, Chaudhry retained New

Jersey counsel to negotiate with the USAO for his surrender on
those charges, and that attorney used the criminal docket number
from the Red Notice to identify the matter number.  Thus, in the
absence of Chaudhry's assertion that he was not aware of the
federal charges, it is unnecessary to explore further whether
the Government was sufficiently diligent in not providing him
with formal notice of those charges and whether there existed in
the circumstances sufficient justification for not taking steps
beyond those that it did take.[5]

Second, Chaudhry asserts that the Government was not
diligent when it failed to seek his extradition from Pakistan.
The Government learned of Chaudhry's address within Pakistan in
2006, and as just discussed, may have been able to learn of it
years earlier.  The Government decided, however, that it would
be futile to seek his extradition and made no effort to do so.
The Government has made a detailed presentation of the reasons
it decided that the filing of an extradition request would be
futile.  In reply, Chaudhry has not presented any argument,
facts, or authority to suggest that Pakistan would have
cooperated in his extradition.  In these circumstances, the
Government has shown that its failure to seek Chaudhry's
extradition does not undermine its general showing of diligence.

---

[5] If Chaudhry had asserted that he was unaware of the federal
charges, a hearing might have been necessary to explore the
reliability of that assertion.

Third, Chaudhry contends that the USAO is responsible for the delay in his return to the United States following December 2008 because it did not reassign until June 20, 2010, his case file from the AUSA who ceased working on the matter on April 9, 2009, leaving the case unattended by any AUSA during that fourteen month interval.  While there was no AUSA assigned, the FBI case agent continued to function on the case.  In November 2009, the agent requested that he be notified if Chaudhry ever renewed his effort to obtain a passport.  That inquiry led to the State Department notifying the FBI of Chaudhry's May 2010 request for a renewed passport, and the arrangements that were made between the FBI, the State Department and Chaudhry in May and June 2010 for the defendant's return to New York.  Moreover, Chaudhry's attorney never responded to the AUSA's April 2009 message to him, and as a result there is no showing that the Government's failure to make an immediate reassignment of the case to a new AUSA had any impact on the timing of Chaudhry's return to this country.

Finally, Chaudhry argues that the Government has not adequately explained why the Embassy waited from March 2009 to June 2010 to contact him and issue a passport to him so that he could return.  In the portion of the affidavit addressed to this issue, Chaudhry asserts that "Chaudhry received a call from Embassy personnel [approximately March, 2009] to advise Chaudhry

there was problem [sic] issuing the Passport because of the
outstanding warrant, and the Embassy would be back in contact
with Chaudhry".[6]   Chaudhry does not identify with whom he was
speaking at the Embassy in this or any other passage.  He has
also not submitted any affidavit from his New Jersey counsel to
explain why that attorney did not advise the USAO of this
conversation between the Embassy and Chaudhry or of any delay
that Chaudhry now alleges was due to the Embassy's failure to
act.  Gold had previously advised the USAO that the impediment
to Chaudhry's return was the record of the arrest warrant in the
Interpol database, and that his client wanted a commitment from
the Government that he would be released on his own
recognizance.  When the AUSA advised Gold that the court would
set bail and that it would not agree to bail conditions in
advance of Chaudhry's return, Gold ceased all communication with
the USAO.  Then, when Chaudhry renewed his contact with the
Embassy, the Government promptly took steps to remove the Red
Notice and to provide Chaudhry with the seven-day passport
permitting his return to the United States.  Without more
specificity from Chaudhry identifying with whom he was speaking
at the Embassy, it is impossible for the Government to respond
directly to Chaudhry's assertion.  Nonetheless, it has shown

---

[6] The brackets are in the text of the affidavit.

that it acted promptly to assist Chaudhry in his return to this country when he finally determined that he would do so.

Prejudice

In his moving papers, Chaudhry asserts that he is prejudiced by the asserted ten years' delay since he cannot establish his location on relevant dates, no longer has access to his business documents, has lost contact with potential witnesses, and no longer remembers who might furnish him with an alibi or support any other defense he might proffer.  He also asserts that he is entitled to a presumption of prejudice given the length of the delay.

Chaudhry's general assertion that his ability to defend himself has been impaired by the passage of time is insufficient to establish prejudice.  The Government has the business records from Chaudhry's business, and has produced them to him in discovery.  He has not identified any witness who can be of assistance to him who has died or is otherwise unavailable due to the passage of time.  His failure to show prejudice is underscored by the absence of any mention of prejudice in the reply he filed on this motion.

Conclusion

The defendant's October 12, 2010 request to reconsider the denial of his motion to dismiss the indictment is denied.


SO ORDERED:

Dated:    New York, New York
          October 19, 2010


                                    _____
                                         DENISE COTE
                              United States District Judge

22